Kevin Fong representing Appellant. I'd like to reserve five minutes for rebuttal. May it please the Court. Let me begin with one of the threshold issues, the Rule 54B issue. The starting point is Rule 54B, which does not apply unless there are multiple claims. If a complaint asserts only a single right, then it states a single claim. That is true even if a complaint seeks multiple remedies. Here, the tribe's complaint asserts only a single claim under CERCLA. CERCLA Section 107A provides that a responsible party is liable to a tribe or a state for several remedies. A single finding of liability under CERCLA can support both a remedy of response costs and a remedy of natural resource damages. Both of those remedies are based on a single legal right under Section 107A. Here's a simple analogy. Think of a garden variety auto accident case. You may have several remedies. You may have a remedy for damage to the car. You may have a remedy for economic damage incurred by the plaintiff. You may have a remedy for non-economic damage incurred by the plaintiff. But all of it grows out of the roots of the single claim for negligence. That's essentially what Section 107A of CERCLA is. Well, it's a little bit different, though. Right? It is different. Let me ask you this. If you were to prevail on your response costs, if the plaintiffs were to prevail, if the tribes were to prevail on the response cost claim remedy, does that automatically get them damages for natural resource damages? No, they would have to prove up the amount, if any, of natural resource damages. So why can't you just look at it? I mean, there's no hard and fast rule about what is a claim under 54B. Why can't you just look at it that way? That is, they were seeking a remedy for response costs, which does not automatically mean they're going to get damages. But thinking back to our auto accident example, the exact same is true. Just because the plaintiff recovers damages for totaling the auto, that doesn't necessarily mean that the plaintiff is going to recover damages for lost wages or medical bills or pain and suffering. The exact same thing applies. And I think there is a hard and fast rule as to the multiple claim requirement. The rest of 54B does afford a tremendous amount of discretion to the district court judge and does take into account judicial efficiency. But the one hard and fast rule is the multiple claim requirement, I think. But this isn't a general tort claim. It is CERCLA. And wouldn't this defeat the policy of CERCLA to get these things cleaned up, get things moving? I mean, there is a policy behind CERCLA to remedy these situations. Nowhere does it say let's wait until the last piece of litigation, the last attorney is left standing. But nothing in the current appeal affects the cleanup. The apportionment issue doesn't affect the cleanup. The cleanup is being driven by EPA's preparation of a record of decision. Another issue on the merits that's been decided then. If it has nothing to do with the cleanup, this issue on the merits is done, isn't it? This issue has been decided, so the question for the court is, is this issue part of a single claim or multiple claims? And it is a difficult issue. Counsel, I have a question for you. On your example of the car accident, do we have like a Supreme Court or a Ninth Circuit case that says that if somebody had recovered auto damage but a district court had bifurcated and was going to have a further trial on pain and suffering, that that would not be a claim that could be considered under 54B? I'm not aware of any case directly addressing that situation. I think the closest case to what we have here is the general acquisition case, which does have the language that would address both the auto accident example and the CERCLA 107A example. Essentially, general acquisition says that if you have multiple remedies, that doesn't necessarily mean you have multiple claims. Let me, just so I understand where your objection is coming from. What is the source of your objection? That is, why is this detrimental to your position? We'd love for the court to take the case, but the court still has to convince itself that there was in fact proper issuance of a 54B judgment. No, but what difference does it make if we were to say 54B was improper here? Then what happens? Then it would go back and then what? The 54B judgment would be reversed or vacated. Yeah, it would just be vacated. We would have it end everything up here, but what does that mean? It would go back to the district court, and then there would be a single appeal at the end of the case. But what's going to happen on the district court in that event? Is there a trial that's going to take place? Ultimately, there would be a trial on the natural resource damages issue, yes. And then the response costs would get worked into that? Right. The response costs would be part of the court's final judgment. There would be a single judgment at the end of the case, just as there would be in almost any other case except in surplus. Okay, turning to the merits, on your issue that you've been arguing, there are very large amounts of funds involved, right? Four million in attorney fees? $4.8 million in attorney fees, a total of $8 million in litigation costs. Similar amount in expert or consultant costs? A little bit less. The total is $8 million. Okay, so now if a tribe, which is trying to protect their water rights in the area they live in, is bringing such a suit, is it reasonable to say that everything's got to be on ice and they've got to totally finance even everything? That's a function of the single judgment rule in 54B. In a wide range of cases, you don't have an award of attorney's fees or litigation costs until the end of the case. So this is really no different, a problem than you would encounter in any other case other than the magnitude of the amount of time involved because of the speed or lack thereof in circular cases. Okay, let's go on to the other issue. Okay, turning to the merits. The district court's award included $4.8 million in attorney fees, and the district court viewed these as essentially enforcement costs. But the tribes could not properly be awarded enforcement costs because they don't have authority to enforce CERCLA at the upper Columbia River site. Now CERCLA gives authority of enforcement to the president, who in turn has delegated his authority to EPA, and EPA may also delegate its authority to a state or tribes. If there is such a delegation, then a tribe or state may enforce CERCLA and recover its attorney's fees as enforcement costs. And that's because Section 107 of CERCLA allows a tribe to recover costs of removal or remediation, and Section 101, sub 25, in turn, says that removal or remediation includes related enforcement activities. But here, the tribes do not have authority to enforce CERCLA at the site because there's been no delegation of enforcement authority by EPA to the tribes in this case. Without any such delegation, an Indian tribe doesn't have enforcement authority under CERCLA. As we noted in our... Consistent with the Washington State Department of Transportation case, doesn't that reject that argument, that the tribes have to get authorization from the federal government? The Department of Transportation case, Washington State Department of Transportation case, really doesn't address the authority at all of whether and when a state has enforcement authority. It's a totally different issue looking at what the scope of authority is of the Department of Transportation under state law. So I've read and reread that case, and there just is nothing going to the issue that's presented here because it wasn't presented in the Washington State DOT case. Then does CERCLA permit citizen suits? Yes, it does. Okay, but then you're saying a citizen can sue, but if they prevail, they can't consider their expenses to be enforcement costs. Possibly. It's a different issue. You hear the tribes expressly did not bring a citizen suit. They are not seeking enforcement costs because they bought a citizen suit. They chose not to bring a citizen suit for whatever reason. But they intervened, right? They intervened, but in their complaint and intervention, they did not plead a claim under the citizen suit provisions of CERCLA. They knew it was there in the two individuals' complaint, but they themselves chose not to assert a claim under the CERCLA citizen suit provision. Thank you. One other point. What's the exact language in the statute that says that the president must delegate or somebody must delegate to the tribes? The authority, is there a point? The authority is the Katronic case on page 814 where it has, early in the opinion, a discussion of sections 104 and 106, and it characterizes it as the framework for federal abatement and enforcement. Is there anything in the statute, though, that says that for these other governmental entities, before they can bring in an enforcement response kind of claim that they have to get delegated authority? They clearly can bring a claim for recovery of response costs, which is different from enforcement. Let me read to you the precise language from Katronic so I get it right. So this is at 814. Sections 104 and 106 provide the framework for federal abatement and enforcement actions that the president, the EPA as his delegated agent, or the attorney general initiates. So even with, for example, a federal agency, you could have a federal agency involved. That doesn't say that an entity like the tribes can't bring an enforcement proceeding. It doesn't address tribes. It doesn't say that, and it doesn't say that in the statute either. Well, we know that tribes don't have inherent enforcement authority or enforcement authority under CERCLA itself because there is a provision, section 126 of CERCLA, which set forth in much, much detail what the roles of a tribe may be, and nowhere is there a mention in 126 of enforcement authority. It's just not included in the list. Now remember, stepping back for a second, this Court's decision in U.S. v. Chapman  unless there's explicit congressional authorization. Not something reading in between the lines or implied. There has to be an explicit congressional authorization. In Chapman, this Court held that the federal government may recover its attorney's fees for enforcement activities, which in that case was a civil action by EPA to compel a responsible party to clean up a site. And in fact, Chapman specifically notes the legislative history of the sections in question and says that those sections confirm EPA's authority to recover costs for enforcement action. So, very interesting. When Chapman identifies explicit congressional authorization, it looks to 104, which has an explicit congressional authorization for EPA to bring an enforcement action. There's nothing comparable for a tribe. Turning quickly to the apportionment issue, Tech has asserted an affirmative defense of apportionment, and the Supreme Court has held that apportionment is proper when there's a reasonable basis for apportionment. The typical case is where you have a stream or river and it's polluted by more than one factory. The harm may be apportioned according to the evidence of the quantities of pollution. That's the case here. This is not the case of a single indivisible injury like a death, a broken leg, a burnt house, a dead cow. It doesn't resemble it at all. Here, Tech submitted evidence that there is indeed a reasonable basis for apportioning the harm. There was expert testimony. There, at the very minimum, is a disputed issue of fact on the various issues raised by plaintiffs. Let me just ... I mean, this may seem like a simple question, but are there any cases that suggest apportionment occurs when there are not third parties brought in by the defendant? I mean, you're not pointing to any ... I mean, there's some kind of phantom trail, mind trailings out there. That's actually consistent with most of the cases. Most of the cases do not involve a specific third-party defendant either. They don't involve multiple defendants where they're fighting among themselves about how to ... Because in many of these cases, the third parties aren't brought in until later in the case after most of the issues have been resolved. Who are you asking to portion the cost with? It's just to fairly apportion Tech's responsibility. And then ... There may be other potential responsible parties. Oh, absolutely. There may be other potential parties, governmental or otherwise. How long has this litigation been going on? Twelve years. And is there anything in the record to say you've actually identified another responsible party? Oh, yes. Mark John's expert report actually does identify the other sources of the various metals at issue. Let me just spend two minutes on the testimony of Dr. Lesopolis. He was retained to determine whether there were hazardous substances at the site and determine the origin. He had access to all the available data. That's clear at 257 to 258 of the excerpts. He reviewed more than a dozen EPA reports or reports by EPA or its consultants. They're listed in the reference list of his report at 818, 821, and 825 of the excerpts. And at the end of the day, he opined that only certain potentially toxic substances are released from the slag from the trail smelter. And also in his deposition, he admitted that those are the only ones that he had sufficient information to form an opinion that they were toxic. And this was after he had reviewed all the EPA studies. So it wasn't a tactical decision by plaintiffs to look only at six metals. In fact, those were the only six metals that were shown by EPA study to be potentially toxic. I'd like to reserve my remaining time for rebuttal. Thank you. Thank you. Okay, is this Mr. Dayton? Good morning, Your Honors. May it please the Court, my name is Paul Dayton. I am Counsel for the Confederated Tribes of the Global Reservation. I have members of the tribe with me here today, including Chairman Marchand. I also have with me my colleague, Counsel for the State, Andy Fitz. He and I will divide the argument this morning. I will speak briefly on the first two questions, Rule 54B and jurisdiction, and then I will turn to the question of recovery of response costs. Mr. Fitz will take the divisibility issues. Before I turn to the specific points that Tech has raised, brief background is useful. This case has been going on, this litigation has been going on since 2000, or at least forms of it since 2004. The case itself is concerned with response to contamination of the upper Columbia River. For more than 100 years, Tech Metals and its predecessors dumped slag and effluent into the Columbia River at trail. 9.97 million tons of it flowed downstream into Lake Roosevelt, where much of it is found today. Beginning in 1999, my client, the Confederated Tribes of the Colville Reservation, began responding to the site, responding to contamination at the site. They petitioned EPA to conduct a site investigation. They joined with EPA in a coordinated fashion to accomplish that investigation. After Tech refused to comply with EPA's unilateral administrative order, identifying Tech as a responsible party and requiring participation in a CERCLA remedial investigation and feasibility study, the tribes responded by funding a citizen suit to enforce the unilateral administrative order. The State of Washington joined, and that culminated in what we call the Pacotus I decision, establishing that CERCLA applies to require Tech to participate in any cleanup of the site. The tribes then spent more than $3 million investigating and evaluating site conditions and developing evidence that was provided to EPA and used in response cost litigation. That work contradicted Tech's adamant denial that it was the source of contamination at the site, its adamant denial that its wastes had released hazardous substances to the site. After two trials, the district court found Tech a liable party under CERCLA and awarded the tribes response costs. Tech now appeals and raises four issues on appeal. The first is Rule 54B. Tech urges that this case, even though this portion of it has been pending since 2008, is not ripe for appeal and must wait until the remaining cause of action, natural resource damages, is adjudicated. The district court did not agree with Tech. The district court, in its decision, reasoned that cost recovery in this case is complete. The two causes of action to establish the entitlement to recover response costs and the amount of the response costs have been decided, and now this case is ready for review. Counsel, how do you respond to the argument of the appellant that there's only one claim, namely a claim for violating CERCLA? Well, Your Honor... The response costs and natural resource damage are just damages flowing from one violation. The causes of action are all CERCLA causes of action, but each of the causes of action have different elements and different remedies. In that way, they are fundamentally distinct from the two cases that Tech likes to cite, the Arizona carpenters case and the United States Supreme Court's decision in Liberty Lobby. Both of those cases involved instances in which either liability was decided or some form of remedy was decided by the district judge, and the district judge then certified the decision for review, and either the Court of Appeals or Supreme Court said, no, you haven't fully adjudicated the case. This case is actually much more like the Supreme Court's decision in Curtis Wright, in which the court said, certification requires determination of a final judgment has been entered on a cognizable claim for relief. It must be final in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action. That's exactly what happened here. A case was tried, liability was determined, damages were determined, the remedy was determined, and the judges now found that Tech is responsible for more than $8 million of response costs, which Tech does not want to pay until many years into the future. The cause of action that remains, which is natural resource damages, is fundamentally different than those two causes of action. The response causes of action concerns proof only of a single instance of release of hazardous substances into the environment of the Upper Columbia River. A natural resource damage cause of action, in contrast, which is the cause of action that remains, involves proof of contamination throughout the 150-river mile site and, frankly, more complicated, proof of a causal relation between those deposits throughout the 150-mile site and injury to the natural resources of the surrounding environment, a much more extensive and comprehensive set of proof, and certainly to recall the Court's questions of counsel. Adjudication of the two causes of action which has occurred in no way determines the outcome of the ultimate natural resource damage. The term cause of action is not in 54B. That's true. Are they the same as a claim? Well, Your Honor, the Supreme Court in the Liberty Lobby case said we do not need to decide what a claim means, and so the Court has not given us guidance on how to apply it. What does a cause of action mean for you? A cause of action to me, as a litigator, a cause of action means a set of elements. I have to prove a series of elements in order to establish a right of recovery, and those elements include liability and they include damages. And once I have established those elements in a cause of action, and if I prove them, I win. And a claim? What does a claim mean? I think a claim, in the context of Rule 54B, it has to mean the same thing because that's what we're concerned with. In Rule 54, we're concerned with are we done now with a claim such that final judgment can be entered and we can deal with other claims later and review can occur now. And so I think that that adjudication of claims has occurred, as the District Court judge noted, and now the case properly, the final judgment is properly entered, and frankly, my client is properly paid for the response costs that have been awarded. Turning to the second argument, Your Honors, which is jurisdiction, I will say briefly there are two issues raised by Tech. First, they dispute that the District Court should have applied Calder because they reason that this is not an intentional tort. This case does not involve intentional torts and Calder applies only to intentional torts. That's wrong. First, this Court has already decided in Pecotus 1 that Calder applies to this case. And so there's no basis now to say Calder doesn't apply here. There's a legion of cases that apply Calder in non-intentional tort cases. The second issue on jurisdiction that Tech raises is the argument that there's no proof of express aiming, which is the requirement under Calder. That's flatly false. The District Court rejected that conclusion and made a series of findings that demonstrate express aiming. The most concrete and relevant of which is that Tech, in the words of its own environment manager, has been treating Lake Roosevelt as its own free, convenient waste facility. I think that's sufficient to demonstrate express aiming for the purpose of jurisdiction. Let me turn, then, Your Honors, to the third question that is my responsibility this morning. That is the question of whether response costs are recoverable here by the tribes based on the work that it did in originally petitioning EPA to investigate the site, then conducting its own site investigation and assessment, and ultimately proving Tech's liability. On that subject, Tech wishes to start with a phantom element of enforcement authority, but I would like to start with the statute. The statute in question is Section 107A, and that statute is very clear. That statute gives the governmental entities, such as the tribes, the State, and the Federal Government, the right to recover response costs. There's no words such as enforcement authority there. The words are very simple. That proof of liability gives a right of recovery of response costs. The District Court reasoned in that way as well, and the District Court looked at the costs that were asserted here, and the District Court found that the extensive site investigation that had been done by the tribes, which included fingerprinting Tech's slag, which included proving the releases to the environment, I will say against a steadfast opposition to Tech, which reasoned that there had been no release at all, that work investigating site conditions was necessary to assess the site conditions. And that's the definition, Your Honors, in CERCLA for recoverable response costs. And the District Court was satisfied that the proof of that work is proof of what is technically a removal, and that supported more than $3 million of response cost award. Once that amount is determined, then it's straightforward that the CERCLA statute, which includes in its definition of response costs, enforcement costs related thereto, encompasses the costs that must be incurred in order to prove entitlement to recover those response costs. So that evidence alone is sufficient to establish what's required for recovery under Section 107A. Tech doesn't start there. It starts with a proposition that, well, no, you must first prove that you have enforcement authority before you can recover the costs that are authorized to you, meaning the tribes, under Section 107A. There is, of course, no case that says that. And there is a case from this circuit that rejects that. The Washington Transportation case very clearly states that there is no precondition of enforcement authority that's necessary before the state can recover its response costs. The same analysis applies here. Certainly enforcement costs is actually a much more mundane concept. It's used in many CERCLA cases to explain that when a party proceeds under Section 907A, it's entitled to recover. It's enforcing Section 9607A. That's what enforcement costs related thereto means. The tribe has done that here and should be entitled to recover those costs now. So I've used ten minutes of our time, and I'll give the rest of the time to my co-counsel, Mr. Fitz. Good morning, Your Honors. May it please the Court. My name is Andrew Fitz on behalf of the State of Washington. Before I turn to divisibility, I want to make two quick points about the response costs argument. First, as we pointed out in our briefing, and Tech never addressed this, there actually, I will represent to the Court, no delegation of authority from EPA to a state or a tribe, even under a cooperative agreement. We've cited to the rules that establish eligibility for those cooperative agreements. They require the state or the tribe to show it has its own jurisdiction, administrative ability to pursue enforcement to compel cleanup or recover response costs. Also, and this is outside the briefing, but I invite the Court to look at Executive Order 12580, where the President delegates authority. There again, in Sections 4 and 6, no provision for delegation to a state or tribe. But that doesn't matter, because we're talking about a different sort of enforcement at stake. And the last point I'll make is, if you look at the Chapman case, under Tech's theory, EPA would not have recovered response costs, litigation costs in that case. Because even though it had issued an order to the PRP, the defendant, it was not suing to enforce the order in that case. It was just suing to recover money. And the Court held that that was enforcement, that those were allowable costs. Turning to the divisibility issue, I want to emphasize a point from our briefing at the outset. Tech has said today that there are material issues of fact that the Court should have held trial on. But before we even get to the merits of what the District Court did, there were subsequent developments in the case that negated Tech's divisibility position. It made three arguments for divisibility. The first was, its slag simply doesn't leach, and its liquid effluent just passes downriver. In other words, we have no share because we have no liability. The second argument was, at the most, maybe our slag leaches a tiny fraction of zinc, but when you compare it to other alleged sources, it's a 0.05% share. And then the third base was a total mass of metals. Tech's alleged inputs versus other alleged inputs. So here are the two things that moot its arguments. First, it stipulated on the eve of trial that, in fact, its slag does leach. Its slag leaches more metals than just zinc, and its liquid effluent did come to repose in the Upper Columbia River, and it also released metals. The other factor is that Tech's volume inputs from other alleged sources that Mr. Johns used as a basis were provided by a different alleged expert, Mr. Brown. Those were asserted both for the divisibility defense and a counterclaim versus the State. And in the context of the counterclaim versus the State, we brought a Daubert motion and Mr. Brown's work was excluded. Tech did not appeal that exclusion. So there is nothing left of Tech's divisibility case, even regardless of the merits of the summary judgment rule. But let's turn to those merits. So under Celotex, it's proper for the district court to grant summary judgment where there is a failure to support an essential element of a claim or defense, and that's the case here. There are two crucial things to understand about this divisibility issue. The first is we as plaintiffs had no burden to allege harm or prove any harm related to this case. It's not a traditional tort case. We have to prove the single release of a single contaminant at a site where we have incurred response costs. So our liability case does not put harm at issue. The second crucial point is that the harm at this site still is not known today. We brought our claim, our suit, at the outset to force Tech in a position to have to investigate and figure out the harm at the site. And Tech fully understood this. It tried to stay our liability case at the outset until a remedial investigation was undertaken. And I want to quote from Tech's stay motion because it's informative. This is from 2008. Quote, this is a complex site encompassing hundreds of miles and numerous contaminants which EPA acknowledges came from multiple sources other than Tech Cominco operating at various times and locations inside and outside the site. For example, dioxins, furans, and PCBs, all substances allegedly part of the contamination addressed by the RIFS and part of plaintiff's claims are from non-smelting sources. That's at ER 1114. When Tech's stay motion was denied, it made the choice to go ahead and pursue a divisibility theory at this point, even though the harm had not yet been characterized, on the theory that it could restrict harm to what it claimed was our case. So it restricted its divisibility case to the release of seven metals only and just in the top five centimeters of sediment, despite the fact that we did not allege that Tech only released these seven metals, that we did not allege that Tech's releases are the only releases at the site, and despite Tech's full awareness that the contamination of the site is not limited to just those seven metals or just that top five centimeters of sediment. It built a fantasy case for divisibility. So the threshold legal question before the district court was whether there was a single harm presented that was theoretically capable of being divided. And from the Bell Petroleum case, to answer that question, it's necessary to, quote, the nature of the harm is the determining factor in whether you can theoretically divide harm. But here we could... But let me ask you this, when you said divide harm, is it dividing harm or apportioning the cost of the cleanup? Well, I think it depends... Are they two directly related? Well, I think they are related in this sense, and I've done a lot of reading of the divisibility cases, and I think my best conception of what harm means in this circle of context is the full extent of contamination from all sources and what is required to remedy that contamination. Now, cost, you know, is an expression of that effort to remedy the contamination, but I think it's those two things together. Because, you know, if you look at the... how much tech should pay to clean up. Ultimately, that's... Possible. It may not be able to, because you may not be able to apportion it, and therefore are jointly and severally liable. Well, and that's what we maintain the case is here. Certainly the posture of the case at this point, in terms of what we know about the site. But I'm just as curious, you keep pointing it in terms of harm as opposed to apportioning the cost. Well, I think, again, I think in this circle of context, and I think that this is part of this court's jurisprudence, even in the Burlington Northern case, which I understand was reversed by the Supreme Court, but I don't think on this issue. You know, the question of what the harm is is not just an expression of dollars. It's a question of, what is the extent of contamination at the site? And tech says, from defendant, and of course it realizes that that can mean nothing here because we only have one defendant. You can't divide tech's own share. So it went off and built this fantasy case. But the harm here does mean more than just N dollars. It means, what is the contamination that has to be addressed under CERCLA? Because that's really what the harm is. And just jumping forward, Your Honor, that's really what happened on summary judgment. We presented evidence in the declaration of John Rowland that there was more contamination at the site than tech accounted for in its divisibility defense. And tech did not dispute that as an issue of fact. It tried to adhere to the legal argument that the only harm it needed to prove was in direct relation to our case. Even though the divisibility case it built went well beyond the allegations that we presented with respect to tech's individual liability. It's, I think, really a fairly simple issue here of a failure of tech to sufficiently bring proof to prove a divisibility case at this juncture. All it had to do was raise a tribal issue of fact, right? And there are none here. I mean, I've already presented the argument as to why all of its alleged issues of fact are moot. But the key is that the facts... That's what later happened before trial or at trial. Correct. But we're talking about what happened at summary judgment. But what happened at summary judgment is the court said the burden is on the defendant to prove harm is divisible. And I will say that that is a very clear burden in case law. You look at Monsanto and the Second Circuit's Alcan case. And tech failed to account there was a larger harm at the site, indisputably, than tech accounted for in its theoretical case of seven metals only in the top five centimeters of sediment. Your Honors, I'm happy to take other questions in my remaining 30 seconds. I'm afraid I don't think your time is remaining. The clock starts to tick upward. You're a little over. But if there's any question from the panel, we'd give you more time. I don't think there is, so thank you. Thank you very much. Okay, Mr. Fong. As with any other summary judgment motion, plaintiffs had the ultimate burden of persuasion of showing that there were no disputed issues of fact and that they were entitled to judgment as a matter of law. To answer the court's question, what are we dividing here? I think the case law is clear from both the Seventh Circuit decision in NCR and the Ninth Circuit's decision in Burlington Northern prior to reversal, that you're really apportioning the contamination. You're apportioning the harm. You're not apportioning the cost. And here... Is there a direct relationship? In other words, if you cause 30% of the harm, you're only responsible for 30% of the cost? In the normal case, unless you have a tripwire or threshold situation like you had in NCR, where anything above a certain threshold would require a particular type of cleanup. Here, there's been no determination of that sort by EPA that there's a particular threshold or tripwire that would require an excavation, you know, for example. So very different factual record than NCR in that respect. Turning to the attorney's fee issue, there must be an express congressional authorization. For example, the CitizenSuit provision of 159 has an express attorney fee provision. There's nothing like that here. The court had asked, what is it in CERCLA? What's the statutory provision providing for delegation by the president to EPA to a state or tribe? Section 104D1A. That's what authorizes EPA to delegate to the state or tribes. And here... If I read it, it's going to tell... It's going to say that in order for the tribe to bring... There need not be any delegation to recover response costs. No, I'm talking about the enforcement activities. For enforcement activity, there has to be a 104... I'm saying if I look at that statute, I haven't looked at it, I don't have it right now in front of me, but when I go back, if I look at it, it's going to tell me that there needs to be some delegation from EPA or somebody to the tribe to pursue these kinds of enforcement activities that we're dealing with here. Yeah, I think that's a fair reading of that section. Also... I'll check it out when I get back in chambers. One portion of the excerpts of record to read in conjunction with that is 209 of the excerpts where the tribes actually disclaimed any responsibility to act as an enforcement authority. So with that, I see my time is up. Thank you, Your Honor. Okay, I want to thank Mr. Fong, Mr. Dayton, Mr. Fitz for your excellent arguments, and this case shall be submitted, and the court will recess until tomorrow. Thank you.
judges: Gould, Paez, McShane